IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCHERING CORPORATION,

    Plaintiff,

  v.

FIRST DATABANK INC.,

    Defendant.
                                        /

No. C 07-01142 WHA

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

This tort action alleges that defendant First DataBank, Incorporated has disseminated and continues to disseminate false information regarding certain asthma medication manufactured by plaintiff Schering Corporation. Schering has filed a motion to preliminarily enjoin the continued publication of allegedly false information. For the reasons stated below, the motion for a preliminary injunction is **DENIED**.[1]

## STATEMENT

Plaintiff Schering develops, manufactures, and markets advanced drug therapies. One of Schering's products is Proventil HFA, an albuterol sulfate metered-dose inhaler. Proventil HFA is approved by the Food and Drug Administration for patients aged four to eleven for the

---

[1] First DataBank has filed a special motion to strike the complaint under California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. *See* Cal. Civ. Proc. Code 425.16. That motion will be addressed in a separate order.

1  treatment and prevention of brochospasm with reversible obstructive airwave disease and the
2  prevention of exercise-induced brochospasm (Kowalski Decl. ¶¶ 12, 14).

3  Defendant First DataBank compiles, edits, and creates information regarding drug
4  products, which it sells to pharmacists, physicians, pharmacy-benefit managers, Medicaid and
5  Medicare reimbursement entities, and others involved in the business of prescribing, dispensing,
6  and paying for prescription drug products. One of First DataBank's publications is the National
7  Drug Data File Plus ("NDDF"), which contains pricing and clinical information about nearly
8  every FDA-approved pharmaceutical product (Breen Decl. ¶¶ 6, 7, 9).

9  Albuterol sulfate metered-dose inhalers like Proventil have been used to treat asthma
10 attacks and other conditions since 1981 (Kowalski Decl. ¶ 6). Metered-dose inhalers suspend
11 albuterol sulfate in a propellant. To date, the most commonly-used propellant has been
12 chlorofluorocarbon, or "CFC." CFC is an ozone-depleting substance. In April 2005, the FDA
13 ruled that CFC must be phased out by December 31, 2008. *See* 70 Fed. Reg. 17,168, 17,169
14 (Apr. 4, 2005).

15 There are now three FDA-approved albuterol sulfate products on the market that do not
16 use CFC: Proventil HFA, Ventolin HFA, and ProAir HFA. All three have the same active
17 ingredient, strength, dosage form, and route of administration (Breen Decl. ¶¶ 10, 11–13, 16 &
18 Exhs. A–C). Because of these similarities, the drugs are considered "pharmaceutically
19 equivalent." Like Proventil HFA, Ventolin HFA has been approved by the FDA for adults and
20 children aged four and older for the treatment of brochospasm with reversible obstructive
21 airway disease and prevention of exercise-induced bronchospasm. ProAir HFA has been
22 approved as safe and effective for patients aged twelve and older (Kowalski Decl. Exh. B at 6,
23 Exh. C).

24 The products differ slightly in other respects. Unlike Proventil HFA, Ventolin HFA
25 does not include any other excipients such as ethanol and oleic acid. ProAir HFA, unlike
26 Proventil HFA, does not include oleic acid as an excipient (Kowalski Decl. Exhs. A, B).

27                    *          *          *

28

The FDA publishes a guide entitled *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly referred to as the *Orange Book*. The *Orange Book* lists FDA-approved drugs and notes whether the FDA has determined if pharmaceutically equivalent drugs available from different suppliers are therapeutically equivalent. Drug products are determined to be pharmaceutical equivalents "if they contain the same active ingredient(s), are of the same dosage form, route of administration and are identical in strength or concentration." Drug products are "considered to be therapeutic equivalents only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling" (Kowalkski Decl. Exh. D at v–vi).[2]

The FDA has assigned all three HFA products a BX rating. All codes beginning with a "B" signify drug products that the "FDA, at this time, considers <u>not to be therapeutically equivalent</u> to other pharmaceutically equivalent products." All "B" codes are further distinguished from each other with "sub-codes," which explain why the FDA considers particular drugs not to be therapeutically equivalent. The sub-code category assigned to the HFA products, "BX," indicates that the data that has been reviewed "are insufficient to determine the therapeutic equivalence." BX products "are presumed to be therapeutically inequivalent until the Agency has determined that there is adequate information to make a full evaluation of therapeutic equivalence" (Kowalski Decl. Exh. D at xvi, xviii; Breen Decl. Exh. F).

---

[2] Regarding therapeutic equivalence, the *Orange Book* more specifically explains:

> FDA classifies as therapeutically equivalent those products that meet the following criteria: (1) they are approved as safe and effective; (2) they are pharmaceutical equivalents in that they (a) contain identical amounts of the same active drug ingredient in the same dosage form and route of administration, and (b) meet compendial or other applicable standards of strength, quality, purity, and identity; (3) they are bioequivalent in that they (a) they do not present a known or potential bioequivalence problem and they meet an acceptable *in vitro* standard, or (b) if they do present such a known or potential problem, they are shown to meet an appropriate bioequivalence standard; (4) they are adequately labeled; (5) they are manufactured in compliance with Current Good Manufacturing regulations

(Kowalkski Decl. Exh. D at vi).

3

The FDA expressly states in the *Orange Book*:

> The List contains public information and advice. It does not mandate the drug products which may be purchased, prescribed, dispensed, or substituted for one another, nor does it, conversely, mandate the products that should be avoided. To the extent that the List sets forth FDA's evaluations of the therapeutic equivalence of drug products that have been approved, it contains FDA's advice to the public, to practitioners and to the states regarding product selection. These evaluations do not constitute determinations that any product is in violation of the Act or that any product is preferable to any other. Therapeutic equivalence evaluations are a scientific judgment based upon evidence, while generic substitution may involve social and economic policy administered by the states, intended to reduce the cost of drugs to consumers

(Kowalkski Decl. Exh. D at ix–x).

\*     \*     \*

First DataBank's NDDF database includes numerous fields of information for each drug, compiled from information provided by the drug's manufacturer, its package insert, and the FDA (Breen Decl. ¶ 7). Among the information that First DataBank creates and publishes regarding drug products is a "generic indicator" ("NDCGI1"). The NDCGI1 indicates whether a particular product's "clinical formulation" is available from one or multiple sources. Products with the same clinical formulation are not necessarily therapeutically equivalent but have the same particular active ingredient, dosage form, route of administration, and strength.[3] In addition, First DataBank assigns a "generic code number" ("GCN") and "generic code sequence number" ("GCN_SEQNO") to each drug product. The NDDF database also includes fields separately describing each product's active ingredient, route of administration, dosage form, drug strength, and *Orange Book* code (Fine Decl. ¶¶ 8–9; Breen Decl. ¶ 33, Exh. D).

The GCN_SEQNO, described as a "clinical formulation identifier," is designed to "aggregate[] drug products that share a like active ingredient set, route of administration, dosage form, and strength of drug but are marketed by multiple manufacturers." The manual explains that the GCN_SEQNO "excels at generating lists of candidates for substitution." The

---

[3] The NDDF's definition of drugs with the same "clinical formulation" thus mirrors the FDA's definition for drugs that are "pharmaceutically equivalent."

4

1 manual cautions, however, that "[a]lthough the GCN_SEQNO can be used to develop a list of
2 candidates for substitution, these candidates are only pharmaceutically equivalent; it is *not*
3 sufficient to determine generic or therapeutic substitutability between drug products without
4 clinical judgment on the part of a doctor or pharmacist." The manual further states that "[a]ny
5 substitution process using the GCN_SEQNO **must**": (1) include "a check against Orange Book
6 Codes," (2) provide for "compliance with State Boards of Pharmacy regulations," (3) "[r]espect
7 state formulary codes," and (4) "[p]rovide opportunity for the exercise of best clinical
8 judgement of the dispensing pharmacist" (Breen Decl. Exh. I at 52, 141–42).

9 With respect to the NDCGI1, First DataBank describes the clinical formulation for
10 Proventil HFA as available from multiple manufacturers. First DataBank has also assigned all
11 three HFA products the same GCN and GCN_SEQNO (Fine Decl. ¶¶ 8–9). The NDDF
12 database added Schering's Proventil HFA in October 1996, Ventolin HFA in February 2002,
13 and ProAir HFA in December 2004. The NDDF database assigned each product the same GCN
14 and GCN_SEQNO when it was added to the database (Breen Decl. ¶ 43).

15 According to declarations by pharmacists submitted by plaintiff Schering, pharmacists
16 relying on First DataBank's information understand that information to mean that an HFA
17 product other than Proventil HFA can be appropriately dispensed when filling a prescription for
18 Proventil HFA. A similar database by First DataBank's competitor, Medi-Span, describes
19 Proventil HFA as "single source," which is understood by pharmacists at other chains to mean
20 that Proventil HFA and other HFA products are not therapeutically equivalent to one another
21 (Oakes Decl. ¶ 10).

22 Notwithstanding Schering's declarations, the declaration of pharmacist James Breen,
23 Senior Director of Knowledge-Base Services at First DataBank, explains:

> In many states, pharmacists are permitted to substitute a drug only if the FDA's *Orange Book* lists it as therapeutically equivalent to the prescribed medication, or they must consult with the prescribing physician to authorize the substitution. In other states, pharmacists are permitted to use their clinical judgment to determine whether a pharmaceutically equivalent drug may be substituted, unless the treating physician has expressly instructed that there be no substitutions. Accordingly, in states that follow the *Orange Book*, pharmacists would be breaking the law to substitute Ventolin HFA or ProAir HFA for Proventil HFA

5

>     prescriptions unless they had the prescribing physician's
>     authorization to make the substitution. In other states,
>     pharmacists are free to substitute Ventolin HFA and ProAir HFA
>     when a doctor prescribes Proventil HFA, as long as the
>     substitution is consistent with the pharmacist's ethical obligations
>     to an individual patient, because the three inhalers are
>     pharmaceutically equivalent

(Breen Decl. ¶ 63).

\*         \*         \*

Schering initiated this suit by filing a complaint in the United States District Court for the District of New Jersey on October 23, 2006. First DataBank moved to dismiss the action for improper venue in November 2006. On January 24, 2007, Magistrate Judge Ronald Heges construed the motion as a motion to transfer venue and transferred the action to this district. *See Schering Corp. v. First Databank, Inc.*, __ F. Supp. 2d __, 2007 WL 831637, at *1 (D.N.J. Jan. 24, 2007).

While that motion was pending in New Jersey, Schering filed a motion for a preliminary injunction to enjoin First DataBank from publishing "false, misleading, and inaccurate information about Schering's product, Proventil HFA." First DataBank filed its own motion in New Jersey to strike Schering's complaint under the California anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. Those motions remained pending when the case was transferred. This order addresses Schering's motion for a preliminary injunction.

**ANALYSIS**

In the Ninth Circuit, a party seeking preliminary injunctive relief must meet one of two tests:

>     The traditional equitable criteria for granting preliminary
>     injunctive relief are (1) a strong likelihood of success on the
>     merits, (2) the possibility of irreparable injury to plaintiff if the
>     preliminary relief is not granted, (3) a balance of hardships
>     favoring the plaintiff, and (4) advancement of the public interest
>     (in certain cases). Alternatively, a court may issue a preliminary
>     injunction if the moving party demonstrates either a combination
>     of probable success on the merits and the possibility of irreparable
>     injury or that serious questions are raised and the balance of
>     hardships tips sharply in his favor.

*Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) (citation and quotations omitted). Under either test, "[t]his analysis creates a continuum: the less certain the

6

1 district court is of the likelihood of success on the merits, the more plaintiffs must convince the
2 district court that the public interest and balance of hardships tip in their favor." *Sw. Voter*
3 *Registration Ed. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). Schering, as
4 the moving party, has the "burden to show the possibility of irreparable injury to itself and the
5 probability of success on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football*
6 *League*, 634 F.2d 1197, 1203 (9th Cir.1980). For the reasons stated below, this order holds that
7 Schering has not established any of the factors that would favor granting a preliminary
8 injunction.

9     **1.**     **PROBABLE SUCCESS ON THE MERITS.**

10 "[T]he test for a preliminary injunction is 'probable success on the merits' or 'fair
11 chance of success on the merits.'" *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427,
12 1430 (9th Cir. 1995) (internal citations omitted); *see also Republic of the Philippines v. Marcos*,
13 862 F.2d 1355, 1362 (9th Cir. 1988) (finding that probable success equates to a showing of "a
14 fair chance of success"). Here, Schering has not yet demonstrated that First DataBank has made
15 any false statement regarding Proventil HFA. The three HFA products have the same active
16 ingredient, strength, dosage form, and route of administration. The NDDF database accurately
17 reports that these products — all with the same clinical formulation — are available from three
18 different manufacturers. Moreover, the NDDF database also includes a field for the FDA's BX
19 code, indicating that the FDA presumes the HFA products not to be therapeutically equivalent.
20 These facts published by First DataBank all appear to be true. At this juncture this order finds it
21 unlikely that Schering would prevail on its claims for product disparagement, negligent
22 publication, or tortious interference with prospective economic advantage.

23 Schering's motion cites to and primarily relies on New Jersey state law to demonstrate a
24 probability of success. First DataBank, however, cites to both California and New Jersey law,
25 noting that the agreement between the parties included a choice-of-law provision that would
26 apply California law to any dispute concerning the agreement (Breen Decl. Exh. J ¶ 14). For
27 preliminary injunction purposes, this order need not decide whether California or New Jersey
28 law applies to the substantive claims in this action. There do not appear to be material

7

1  differences between the two states' treatment of the elements of the claims. Under either state's
2  law, this order holds that on this record, Schering has not yet demonstrated a likelihood of
3  success. This is primarily so because Schering has not shown that First DataBank is publishing
4  false information about Proventil HFA.[4]

### A.  Product Disparagement.

Schering's first claim is one of product disparagement. In New Jersey, the "elements of trade libel [or product disparagement] are: (1) publication; (2) with malice; (3) of false allegations concerning its property, product or business, and (4) special damages, *i.e.* pecuniary harm." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). Similarly, "[u]nder California law, trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage. To prove trade libel, Plaintiff must show: (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages." *New.Net, Inc v. Lavasoft.*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) (citation and quotations omitted).

Schering claims that First DataBank has published false and harmful information regarding Proventil HFA with knowledge of its falsity or in reckless disregard of its truth or falsity. Specifically, Schering contends that the NDDF database wrongly establishes that Proventil HFA, Ventolin HFA, and ProAir HFA are *therapeutically* equivalent and thus can be substituted for each other. Schering also argues that it has suffered pecuniary harm because pharmacists have been induced by the allegedly false information to dispense other HFA products when filling prescriptions for Proventil HFA.

Significantly, the parties agree that all three HFA products are pharmaceutically equivalent because they have the same clinical formulation. They share the same active ingredient (albuterol sulfate), dosage form (aerosol, metered), route of administration (inhalation), and strength (90 mcg of albuterol). These products are also designed to treat

---

[4] This is not to say Schering's case has no merit. These conclusions are only for preliminary injunction purposes. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1432 (9th Cir. 1984) ("The district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved.").

8

"brochospasm with reversible obstructive airway disease" and "exercise-induced bronchospasm." Because these factors are all the same for all three products, it is appropriate for First DataBank to designate the clinical formulation these products share as being available from multiple distributors (Breen Decl. ¶¶ 14–16; Exhs. A–C).

Nothing in First DataBank's NDDF database actually states that the HFA products are therapeutically equivalent. The NDDF database expressly refrains from addressing whether HFA products are therapeutically substitutable. The database manual states that the GCN_SEQNO "can be used to develop a list of *candidates* for substitution" but "these *candidates* are only pharmaceutically equivalent; it is **not** sufficient to determine generic or therapeutic substitutability between drug products without clinical judgement on the part of a doctor or pharmacist." Any "substitution process using the GCN_SEQNO **must**": (1) include "a check against Orange Book Codes," (2) provide for "compliance with State Boards of Pharmacy regulations," (3) "[r]espect state formulary codes," and (4) "[p]rovide opportunity for the exercise of best clinical judgement of the dispensing pharmacist" (Breen Decl. Exh. I at 141–42, italics added). First DataBank also publishes the FDA's BX code for the HFA products in its database. This, of course, communicates to pharmacists the FDA's own assessment that there is insufficient data to determine therapeutic equivalence and that the drugs are therefore presumed to be therapeutically inequivalent.

The NDDF database thus accurately reports that the products are pharmaceutically equivalent, that drugs with this clinical formulation are available from more than one manufacturer, and that the FDA presumes the drugs to be therapeutically inequivalent due to insufficient data. These are all true facts that are conveyed by First DataBank.[5]

---

[5] The FDA recently suggested that the three HFA products are substitutable. In its online "Drug Shortages" statement, the FDA explained:

> Beginning in Early 2006, there have been temporary outages of albuterol inhaler products from some manufacturers. . . . Even though total albuterol supplies (HFA and CFC) are anticipated to meet demand, supplies of HFA albuterol metered dose inhalers are anticipated to increase relative to supplies of CFC inhalers over the next several months. Therefore, HFA inhalers may need to be substituted for CFC inhalers as the shift towards increased HFA inhalers continues to occur. . . . The following firms are

9

1    Schering argues that regardless of First DataBank's intent, pharmacies misinterpret First
2    DataBank's information and consider the three HFA products to be therapeutically equivalent.
3    Schering goes as far as to argue that it is "the consequences of [First DataBank's] *actions*, not
4    its intent, that are relevant and need to be remedied" (Reply Br. 5).  This argument is wrong
5    because product disparagement is an intentional tort.  *See Mayflower Transit, LLC*, 314 F. Supp.
6    2d at 378 (noting that an element for trade libel is malice); *Barnes-Hind, Inc. v. Superior Court*,
7    226 Cal. Rptr. 354, 356 (1986) ("Trade libel is generally distinguished from common-law
8    defamation and is said to connote an intentional disparagement of the quality of property, which
9    results in pecuniary damage to plaintiff.").  Moreover, Schering demonstrates no facts that First
10   DataBank has control over its subscribers and how they interpret and display the relevant
11   information.  First DataBank cannot be liable if its subscribers present the information to
12   pharmacists in a way that arguably changes its meaning.  *See Montandon v. Cox Broad. Corp.*,
13   120 Cal. Rptr. 196, 199 (1975) ("[T]he author of a nonlibelous statement cannot be held liable
14   at all for its being changed into a libelous statement and so published unless he authorized,
15   consented to, or participated in the publication of the article as changed.").

In sum, this order finds that the record herein does not establish that First DataBank's
information is false.  First DataBank's information does not even contradict the FDA's own
conclusions.  Indeed, the FDA's BX code for the HFA products is published alongside the
NDDF database information for those products.  To the extent such data is misinterpreted by

---

> currently producing albuterol and levalbuterol metered dose inhalers. *FDA considers all of these inhalers as options for patients who cannot otherwise get their preferred albuterol brand or product:* . . . Schering-Plough supplies Proventil . . . and PROVENTIL-HFA . . . GlaxoSmithKline — Ventolin-HFA . . . IVAX Laboratories, Inc. has available ProAir HFA

(Breen Exh. H, emphasis added).  No change has been made to the FDA's BX rating of the HFA inhalers, however.  Although the statement considered the three HFA products at issue here to be "options," it did not address therapeutic equivalence.

10

1  First DataBank's subscribers, Schering has not demonstrated that the data has been improperly
2  interpreted by any fault of First DataBank.[6]

### B. Negligent Publication.

Schering's second claim is one for negligent publication. In its motion, Schering argues that First DataBank has a duty of care to the manufacturers and distributors of the products about which it publishes information. Within this duty, Schering contends that First DataBank must ensure that the information communicated is true and accurate. As discussed above, however, this order disagrees that First DataBank's information is false.

There is an independent reason to find it unlikely that Schering would prevail on this claim. It is generally true that "a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct." *People Exp. Airlines, Inc. v. Consol. Rail Corp.*, 495 A.2d 107, 116 (N.J. 1985); *see also J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979) ("Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity."). On these facts, however, there appears to be no negligence liability that can attach. New Jersey courts have recognized: "[A] party does have a duty under certain circumstances not to communicate false information about another party or a product it sells. The parameters of that duty and the circumstances under which an action may be maintained for its breach *are the subject of the laws of defamation and of product disparagement*." *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 465 A.2d 953, 960–61 (N.J. Super. Ct. Law Div. 1983) (citing W. Prosser, The Law of Torts 111, 128 (4th ed. 1971)) (emphasis added). Thus, "a party who claims that its reputation has been damaged by a false

---

[6] Schering notes several times that the FDA has not approved the three HFA products for the same patient populations. Specifically, although Proventil HFA and Ventolin HFA have been approved by the FDA for adults and children four and older, ProAir HFA has only been approved as safe and effective for patients twelve and older (Kowalski Decl. Exh. B at 6, Exh. C). Schering, however, does not establish that ProAir HFA is being dispensed to children aged four through eleven who have been prescribed Proventil HFA. Even if Schering could prove that, Schering has not shown that this substitution would always be improper in light of all the factors pharmacists are to consider when dispensing drugs.

11

statement cannot circumvent the strictures of the law of defamation or product disparagement by labeling its action as one for negligence." *Container Mfg. Inc. v. CIBA-GEIGY Corp.*, 870 F. Supp. 1225, 1236 (D.N.J. 1994) (quoting *Dairy Stores, Inc.*, 465 A.2d at 961). Thus, under New Jersey law, Schering cannot maintain a claim of negligent publication based on any legal duty to the subject of its publication separate from any duty imposed by the law of defamation and product disparagement. Nor does it appear that any such legal duty would arise in California. *See*, *e.g.*, *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 758 (N.D. Cal. 1993) (declining to find that duty arises where "[p]laintiffs provide[d] no authority for the proposition that a legal duty arises in this situation and the Court [was] not aware of any such authority."). The product disparagement claim cannot be duplicated as a negligence claim on these facts.

Schering has cited no authority from either California or New Jersey establishing that a publisher of information owes a duty of care to the subject of its statements where the publisher is also sued, as here, for defamation or product disparagement. Nor has the Court found any authority supporting this proposition. This demonstrates Schering's failure — and lack of attempt — to meet its burden of demonstrating any possibility of success.

### C. Tortious Interference with Economic Advantage.

For its third claim, Schering contends that "[b]y publishing, continuing to publish, and refusing to correct what it knows to be false information about Proventil HFA, First DataBank has, through improper means, intentionally interfered with Schering's reasonable expectation of economic advantage" (Br. 16). Although Schering does not explicitly state what tort it alleges in its third claim, its citation to *J. Fitzpatrick and Co. v. Solna*, No. 89-2668, 1991 WL 186661, *9 (D.N.J. 1991), and *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 36–37 (N.J. 1989), suggests that Schering is attempting to recover based on the tort of intentional interference with prospective economic advantage.

"The elements of this tort are: (1) plaintiff had a reasonable expectation of economic advantage; (2) defendant knew of plaintiff's expectations; (3) defendant intentionally and without justification interfered with plaintiff's reasonable expectations; (4) if defendant had not acted wrongfully there was a reasonable probability that plaintiff would have realized an

economic advantage, and (5) plaintiff sustained damage as a result of defendant's action." *J. Fitzpatrick and Co.*, 1991 WL 186661 at *9. In California, "[t]hese elements are usually stated as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (quotations omitted). In addition, California requires a plaintiff to plead and prove as part of its case-in-chief that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Ibid.*

Here Schering has failed to present evidence that would establish either "malice" or conduct "wrongful by some legal measure other than the fact of interference itself." Schering does not offer evidence of intent by First DataBank to interfere with any of Schering's prospective customers. First DataBank is not even in competition with Schering. In short, Schering has not offered facts to establish that First DataBank's conduct was "both injurious and transgressive of generally accepted standards of common morality or of law" or that the interference by First DataBank was not "sanctioned by the rules of the game." *Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc.*, 619 A.2d 623, 630 (N.J. Super. A.D. 1993) (quotations omitted).

Finally, comment b to the Restatement (Second) of Torts Section 772, states that "[t]here is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another." That Schering has not shown the falsity of First DataBank's information is also potentially fatal to this claim. Schering is unlikely to prevail on its tortious interference claim.

### 2. POSSIBILITY OF IRREPARABLE INJURY.

"A preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). Given Schering's weak showing as to

13

1  probability of success on the merits, Schering would need to make an overwhelming showing of
2  hardship to warrant a preliminary injunction. *See Stuhlbarg Intern. Sales Co., Inc. v. John D.*
3  *Brush and Co., Inc.,* 240 F.3d 832, 840 (9th Cir. 2001).

5  Schering contends that it will suffer irreparable loss in market share if a preliminary
6  injunction does not issue. Schering argues that the lost sales due to allegedly improper
7  substitutions will increase because prescriptions are generally refilled with the product that was
8  originally dispensed (Fine Decl. ¶ 17, Br. 17). Schering contends that this loss of market share
9  is the type of irreparable injury that warrants injunctive relief. This order disagrees.

10  The Ninth Circuit has recognized, albeit perhaps in passing, that the potential loss of
11  market share alone cannot constitute irreparable injury. *See Oakland Tribune, Inc. v. Chronicle*
12  *Pub. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985) ("Plaintiff [newspaper] initially claims
13  injury because it will lose circulation and revenue, but as plaintiff seems to admit, this involves
14  purely monetary harm measurable in damages."). This order holds that allegations of future lost
15  sales, without more than what Schering has demonstrated here, cannot constitute irreparable
16  injury. The Supreme Court has held: "The key word in this consideration is *irreparable*. Mere
17  injuries, however substantial, in terms of money, time and energy necessarily expended in the
18  absence of a stay, are not enough. The possibility that adequate compensatory or other
19  corrective relief will be available at a later date, in the ordinary course of litigation, weighs
20  heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).
21  Here the harm to Schering would be solely economic.

22  Because this motion was originally filed in New Jersey, the parties address Third Circuit
23  precedent. The general rule in the Third Circuit is that which the Ninth Circuit recognized in
24  *Oakland Tribune*. Specifically, merely suffering "substantial lost profits" is "compensable by
25  money damages" and does not constitute irreparable injury. *Frank's GMC Truck Center, Inc. v.*
26  *Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). Schering relies on *Novartis Consumer*
27  *Health, Inc. v. Johnson & Johnson-Merck*, 290 F.3d 578, 596 (3d Cir. 2002), in which the Third
28  Circuit stated that "[w]e are satisfied that this loss of market share constitutes irreparable harm."

1  Any exceptions to the general rule, however, have been limited to "narrow circumstances:
2  where the market share loss occurs in a competitive industry where consumers are brand-loyal
3  and will likely result in a permanent loss of customers, *Novartis Consumer Health*, 290 F.3d at
4  596, or where the company may be rendered insolvent by continuing antitrust violations.
5  *Beilowitz v. General Motors Corp.*, 233 F. Supp. 2d 631, 644 (D.N.J. 2002)." *Ortho Biotech*
6  *Prods., L.P. v. Amgen Inc.*, 2006 WL 3392939, at *6–*7 (D.N.J. Nov. 21, 2006).

7  Here, those narrow circumstances are not applicable because it is pharmacists — not
8  brand-loyal consumers — who are making decisions based on drug efficacy, price, and
9  availability. Moreover, Schering does not contend that it is at risk of becoming insolvent if a
10 preliminary injunction does not issue. This order holds that this case falls under the general
11 principle that "the temporary loss of income, ultimately to be recovered, does not usually
12 constitute irreparable injury." *Sampson*, 415 U.S. at 90. Schering has identified no injury that
13 would not be compensable by monetary judgment following a full trial on the merits.

14 **3.    PUBLIC INTEREST.**

15 This order also considers the public interest. "The public interest inquiry primarily
16 addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*,
17 303 F.3d 959, 974 (9th Cir. 2002). It has been recognized that "[w]hen an allegedly false claim
18 pertains to a prescription drug, the public interest in receiving truthful information is
19 particularly acute." *Zeneca Inc. v. Eli Lilly and Co.*, 99 CIV. 1452(JGK), 1999 WL 509471, at
20 *41 (S.D.N.Y. July 19, 1999).

21 In this case, notwithstanding that the NDDF database is not publically available, there is
22 no question that the NDDF's information about particular drugs is of interest to the public.
23 Asthma patients have a great interest in ensuring that they receive the appropriate medication to
24 treat their symptoms. The thousands of patients who are prescribed Proventil HFA have an
25 interest in the safety of interchanging prescription drugs.

26 But the fact that First DataBank's statements may be of interest to the public does not
27 mean that the public is at risk if the injunction is not granted. Here, Schering has not made any
28 showing that the public has been or will be harmed by the substitution of other HFA products

15

1  for Proventil HFA. The lack of evidence on this point is glaring. For all the effort Schering
2  expends to highlight subtle differences in the various HFA products, Schering cites not a single
3  instance wherein a patient who was prescribed Proventil HFA but provided another HFA
4  product suffered any harm as a result of the substitution. Nor, after filing voluminous exhibits
5  and declarations, does Schering offer any evidence regarding how differences in the HFA
6  products could even theoretically cause harm. This lack of support undermines Schering's
7  motion.

8  The states' interest in regulating pharmacists is also at issue. In the states that do not
9  strictly follow the *Orange Book*, pharmacists may substitute pharmaceutically equivalent drugs
10 so long as the substitution is consistent with the pharmacist's ethical obligations and state
11 regulations (Breen Decl. ¶ 63). None of the pharmacists who submitted declarations in support
12 of Schering's motion stated that substitution of the HFA products would violate any ethical
13 obligations. Nor does Schering argue that any ethical violations have occurred or will occur.

14 In sum, the public interest is implicated here but Schering has not demonstrated through
15 competent evidence that there would be any harm to the public were no preliminary injunction
16 to issue.

## CONCLUSION

18 After considering all the relevant factors, this order **DENIES** Schering's motion for a
19 preliminary injunction. Prior to a full determination on the merits, it would be imprudent to
20 require First DataBank to alter its database — a database that is only one of many resources a
21 pharmacist may consult when substituting one product for another. The NDDF is not a binding
22 guideline followed by all pharmacists. It simply contains information to which pharmacists
23 may refer. Pharmacists may consider the ingredients of the various drugs, the *Orange Book*
24 codes (which are included in the NDDF database), any recommendation or instruction by the
25 prescribing physician, state regulatory rules, and their own expertise. Schering has failed to
26 make a convincing showing of the irreparability of injury, a likelihood of success on its claims,

or any other factor that would favor granting a preliminary injunction. Finally, that this order has examined New Jersey law as well as California law should not be taken as a holding that this Court has concluded that it must necessarily apply the law of either jurisdiction in further orders.

**IT IS SO ORDERED.**

Dated: April 10, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE