IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCHERING CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>FIRST DATABANK INC.,<br><br>    Defendant.<br>_____ / | No. C 07-01142 WHA<br><br>**ORDER DENYING SPECIAL MOTION TO STRIKE** |

**INTRODUCTION**

In this tort action, defendant First DataBank Incorporated moves to strike the complaint under California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. This order holds that California's anti-SLAPP statute does not apply to the instant action. Furthermore, even if it did apply, the motion would be denied. Accordingly, for the below-stated reasons, First DataBank's motion to strike is **DENIED**.

**STATEMENT**

By order dated April 10, 2007, the Court denied plaintiff Schering Corporation's motion for a preliminary injunction. *See Schering Corp. v. First Databank Inc.*, No. C 07-01142 WHA, 2007 WL 1068206 at *1 (N.D. Cal. Apr. 10, 2007). The full procedural and factual history of this action is set forth there and is recounted here only in brief.

First DataBank creates a database called the National Data Drug File Plus ("NDDF"), which it disseminates to licensed purchasers. The NDDF database contains pricing and clinical

information about nearly every Food and Drug Administration-approved pharmaceutical product. First DataBank has its principal place of business in California (Breen Decl. ¶¶ 6, 7, 9).

Schering develops and manufactures pharmaceutical products. It operates in New Jersey. One of Schering's products is Proventil HFA, an albuterol sulfate metered-dose inhaler. Proventil HFA is approved by the Food and Drug Administration for patients aged four to eleven for the treatment and prevention of brochospasm with reversible obstructive airway disease and the prevention of exercise-induced brochospasm (Kowalski Decl. ¶¶ 12, 14).

There are two other comparable FDA-approved albuterol sulfate metered-dose inhalers on the market: Ventolin HFA, manufactured by GlaxoSmithKline, and ProAir HFA, manufactured by IVAX Pharmaceuticals. Ventolin HFA has been approved by the FDA for adults and children aged four and older for the treatment of brochospasm with reversible obstructive airway disease and prevention of exercise-induced bronchospasm. ProAir HFA has been approved as safe and effective for patients aged twelve and older who suffer from the same conditions (Breen Decl. Exhs. B, C; Kowalski Decl. Exh. B at 6, Exh. C). In addition, unlike Proventil HFA, Ventolin HFA does not include any other excipients such as ethanol and oleic acid. And ProAir HFA, unlike Proventil HFA, does not include oleic acid as an excipient (Kowalski Decl. Exhs. A, B).

The FDA publishes a guide entitled *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly referred to as the *Orange Book*. The *Orange Book* lists FDA-approved drugs and notes whether the FDA has determined if pharmaceutically equivalent drugs available from different suppliers are therapeutically equivalent. Because the three products have the same active ingredients, dosage form, route of administration, and strength, they are considered to be *pharmaceutical* equivalents. Drug products are considered *therapeutic* equivalents, however, "only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling" (Kowalkski Decl. Exh. D at v–vi).

2

The FDA has assigned all three of the HFA products a "BX" code. This indicates that, due to insufficient information, the FDA considers the three products to be pharmaceutically equivalent but currently presumes them not to be therapeutically equivalent (Kowalski Decl. Exh. D at xvi, xviii; Breen Decl. Exh. F).

Included in the information published in First DataBank's NDDF database are a "generic indicator," a "generic code number," and a "generic code sequence number." The generic indicator for the HFA products indicates that the products are "multi-source." This means that the three products — with the same active ingredient, dosage form, route of administration, and strength — are available from several manufacturers. The generic code number groups together pharmaceutically equivalent products with the same "ingredients, strength, dosage form and route." Somewhat relatedly, the generic code sequence number groups together products that are pharmaceutically equivalent but are "marketed by multiple manufacturers." The generic code sequence number "excels at generating lists of candidates for substitution," although it alone is not sufficient to determine generic or therapeutic substitutability. First DataBank has assigned all three HFA products the same generic code sequence number and generic code number (Fine Decl. ¶¶ 8–9; Breen Decl. ¶¶ 33, 43; Exh. D; Exh. I at 52, 141–42; Mot. for Preliminary Injunction Exh. 3).

Schering filed the complaint in this case in the District of New Jersey on October 23, 2006. Schering's complaint alleges that First DataBank publishes false information indicating that all three HFA products are therapeutically substitutable when the FDA has made no such determination. Under that theory, Schering asserts claims for trade libel, negligent publication, and tortious interference with economic advantage.

On January 24, 2007, Magistrate Judge Ronald Heges transferred the action to this district pursuant to 28 U.S.C. 1404(a). *See Schering Corp. v. First Databank, Inc.*, __ F. Supp. 2d __, 2007 WL 831637 at *1 (D.N.J. Jan. 24, 2007). Following the transfer, an order dated April 10, 2007, denied Schering's motion for a preliminary injunction. This order addresses

3

First DataBank's motion to strike Schering's complaint pursuant to the California anti-SLAPP statute.

## ANALYSIS

First DataBank specially moves to strike plaintiff's complaint under California's anti-SLAPP statute.

> In 1992, responding to the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," the California Legislature enacted the Anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) statute. Cal. Civ. Proc. Code § 425.16(a). The statute was intended to "encourage continued participation in matters of public significance" and to prevent the chilling of such participation through abuse of the judicial process. To that end, the statute directs courts to construe the statute broadly.
>
> The statute is designed to allow for early dismissal of non-meritorious cases aimed at chilling First Amendment expression through costly, time-consuming litigation. Under the statute, a civil defendant, at the infant stages of the litigation, may move to strike a plaintiff's SLAPP complaint, which is defined as a non-meritorious action brought against a person arising "from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1).

*New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1098–99 (C.D. Cal. 2004) (some citations and quotations omitted). At issue in this case are the anti-SLAPP statute's provision for special motions to strike, Cal. Civ. Proc. Code 425.16(b)(1), and the provision entitling a party prevailing on a special motion to strike to fees and costs, Cal. Civ. Proc. Code 425.16(b)(1). The Ninth Circuit has "determined that California anti-SLAPP motions to strike and entitlement to fees and costs are available to litigants proceeding in federal court, and that these provisions do not conflict with the Federal Rules of Civil Procedure." *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206, 1206–07 (9th Cir. 2005) (citing *United States ex rel. Newsham v. Lockheed*

4

*Missiles & Space Co.*, 190 F.3d 963, 970–73 (9th Cir. 1999)).[1] One may well ask how a California statute can regulate the federal exercise of judicial power. One explanation may be that the Ninth Circuit has generally approved such a restriction only in diversity cases where California substantive law was being applied. *See Bosley Med. Institute, Inc. v. Kremer*, 403 F.3d 672, 682 (9th Cir. 2005); *Thomas*, 400 F.3d at 1206; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003); *Lockheed Missiles & Space Co.*, 190 F.3d at 970–73; *but see Batzel v. Smith*, 333 F.3d 1018, 1025–26 (9th Cir. 2003) (considering federal substantive law).

Although provisions of California's anti-SLAPP statute *can* be available in federal court, whether those provisions are available in this action implicates a unique choice-of-law question: whether New Jersey would apply California's anti-SLAPP statute to cases properly brought in New Jersey. This case was transferred to this district from the District of New Jersey pursuant to 28 U.S.C. 1404(a), which permits transfer for "the convenience of parties and witnesses" and "in the interest of justice." When a case is transferred on grounds of convenience pursuant to 28 U.S.C. 1404(a), the transferee court must apply the original transferor court's choice-of-law rules. *See S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. The Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981). In diversity cases, federal courts must apply the conflict-of-law principles of the forum state. *See Sarlot-Kantarjian v. First Penn. Mortgage Trust*, 599 F.2d 915, 917 (9th Cir. 1979). Thus all choice-of-law questions herein must be resolved under New Jersey choice-of-law rules.

### 1. WHETHER CALIFORNIA'S ANTI-SLAPP STATUTE APPLIES UNDER NEW JERSEY CHOICE-OF-LAW RULES.

This order must now determine whether the New Jersey courts would apply California's anti-SLAPP statute to this action. New Jersey courts "employ a flexible

---

[1] In *Metabolife International Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001), the Ninth Circuit held that Section 425.16(f) — limiting the time for filing a motion to strike — and Section 425.16(g) — staying discovery pending resolution of the motion — do not apply in federal court. Those statutory provisions are not at issue in the present motion.

1  'governmental-interest' analysis to determine which state has the greatest interest in governing
2  the specific issue that arises in the underlying litigation." *Erny v. Estate of Merola*, 792 A.2d
3  1208, 1212–13 (N.J. 2002). "Ordinarily, choice-of-law determinations are made on an
4  issue-by-issue basis, with each issue receiving separate analysis." *Id.* at 1213. "It is thus
5  conceivable that the law of one jurisdiction may apply to one issue in a matter and the law of a
6  second jurisdiction to another." *Grossman v. Club Med Sales, Inc.*, 640 A.2d 1194, 1199 (N.J.
7  App. Div. 1994).

8  In the first prong of the governmental-interest test, the Court must "determine whether
9  there is an actual conflict between the laws of the states involved." *Erny*, 792 A.2d at 1216.
10 Here, there appears to be an actual conflict. The California legislature has enacted an
11 anti-SLAPP statute to prevent lawsuits that are "brought primarily to chill the valid exercise of
12 the constitutional rights of freedom of speech and petition for the redress of grievances."
13 Cal. Civ. Proc. Code 425.16(a). There does not appear to be, nor has either party identified, any
14 similar provision in New Jersey.[2]

15 "The second prong of the governmental-interest analysis requires the Court to determine
16 the interest that each state has in applying its" law to the parties in the instant litigation. *Erny*
17 792 A.2d at 1216. For this second prong, New Jersey relies heavily on the various principles
18 set forth in the Restatement (Second) Conflict of Laws. *See id.* at 1216–18; *Fu v. Fu*, 733 A.2d
19 1133, 1140–41 (N.J. 1999). Specifically, five factors drawn from Section 145 of the
20 Restatement guide the governmental-interest analysis in tort cases: "(1) the interests of
21 interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law;

---

[2] New Jersey courts have held that SLAPP suits may satisfy the "special grievance" element of a malicious prosecution suit arising out of a civil lawsuit "because of the chilling effect . . . upon [a person's] First Amendment freedom of speech and right to protest." *Turner v. Wong*, 832 A.2d 340, 351 (N.J. Super. Ct. App. Div. 2003). In another decision, the Appellate Division of the New Jersey Superior Court evinced a strong disfavor for SLAPP suits. *See LoBiondo v. Schwartz*, 733 A.2d 516, 518 (N.J. Super. Ct. App. Div. 1999) ("Our careful scrutiny of this voluminous record persuades us that plaintiffs' complaint should have been promptly dismissed with prejudice on defendants' motion for summary judgment. . . . Defendants were exercising their constitutional right to participate in public debate, to express themselves regarding matters of public concern, and to petition governmental agencies and officers for redress of their legitimate grievances. Their speech was privileged, and they did not abuse their privilege.").

6

(4) the interests of judicial administration; and (5) the competing interests of the states." *Erny*, 792 A.2d at 1217.

The most important factor is the competing interests of the states. Thus, "the initial focus should be on what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation." *Ibid.* (quotations and alterations omitted). New Jersey courts also follow the Restatement's guidance as to the other four factors:

> When considering the interests of interstate comity, a court must determine whether application of a competing state's law would frustrate the policies of other interested states. When determining the interests underlying the field of tort law, a court must consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law. Because every tort rule, to some extent, is designed both to deter and to compensate, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to a specific rule.
>
> The remaining two factors are less significant for the purpose of making choice-of-law determinations in tort actions. The interests of the parties plays a small role because a person who causes an unintentional injury is not necessarily aware of the law that may be applied to the consequences of his actions. The interests of judicial administration afford courts a chance to consider the practicality of applying a specific law in a given situation; however, to the extent that that factor conflicts with a strong state policy, the factor yields.

*Ibid.* (quotations and citations omitted).

### A. General Principle.

This order acknowledges the Restatement's principle that in cases involving "multistate defamation," when a "corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state." Restatement (Second) Conflict of Laws

7

150(3). Here, a viable claim by Schering is its trade libel claim.[3] Schering alleges that First DataBank has disseminated false statements about Schering's product, Proventil HFA, in First DataBank's nationally-distributed NDDF database. Applying Section 150 to this case, Schering's "principal place of business," New Jersey, should be presumed the "state of most significant relationship" to this action.

### B. States' Competing Interests and Interstate Comity.

This order now turns to the factors to be considered in the governmental-interest analysis. The most important factor is the competing interests of the states. In addition, in this case, the competing-interest consideration implicates another factor — the interests of interstate comity. On balance, these factors tip toward refusing to apply California's anti-SLAPP statute in a New Jersey lawsuit.

The California legislature has expressed a strong policy against the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." Cal. Civ. Proc. Code 425.16(a). To that end, the anti-SLAPP statute was enacted to prevent the chilling of those rights through "abuse of the judicial process." In the Court's view, implicit in this policy is the legislature's intent to stem the influx of meritless lawsuits brought in *California* courts. It is doubtful whether California's policies were intended to have a substantive effect on potential abuses of the judicial process in other states.

The New Jersey state policy is not entirely antithetical to California's interests. Indeed, the New Jersey Supreme Court has "repeatedly encouraged the use of summary judgment as a

---

[3] It is generally recognized that the torts of trade libel and defamation are distinct torts. *See Black & Yates v. Mahogany Ass'n*, 129 F.2d 227, 235–36 (3d Cir. 1941) ("There is a clear line of demarcation between the two torts which is often overlooked."); Restatement (Second) of Torts 623A, cmt. g. The two torts, however, are similar enough that they operate identically for choice-of-law analyses. Indeed, "[b]oth involve the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff." Restatement (Second) of Torts 623A cmt. g. This is supported by Section 151 of the Restatement (Second) Conflict of Laws, which provides that "[t]he choice-of-law rules involving injurious falsehood are the same as those involving defamation."

1  technique to dispose expeditiously of meritless defamation actions, thereby to lessen the chill
2  that the institution of such actions inevitably has on the exercise of free speech." *LoBiondo*,
3  733 A.2d at 529; *see also Fu*, 733 A.2d at 1142 ("The 'law' can be either the decisional or
4  statutory law of a state.").[4]  Notwithstanding that court-recognized policy, the New Jersey
5  legislature has chosen not to enact an anti-SLAPP statute. Anti-SLAPP proposals were
6  introduced in the New Jersey legislature in 1996 and 1998. *See* California Anti-SLAPP Project,
7  *at* http://www.casp.net/statenj.html.  Those were never enacted into law.  More recently,
8  identical proposals for an anti-SLAPP statute were introduced in the New Jersey state assembly
9  and senate during the 2006–07 legislative session. *See* S697 and A2652, *available at*
10 http://www.njleg.state.nj.us/bills/BillsByNumber.asp.  No action has been recorded since early
11 2006.  Those proposals are still before judiciary committees.

12 The application of California's anti-SLAPP statute here would frustrate New Jersey's
13 current policy of using summary judgment — rather than a legislatively-constructed
14 device — to dismiss groundless actions designed to chill protected speech.  How individual
15 states choose to prevent the abuse of process within their own courts is best left to individual
16 states to decide for themselves.  And while "California has a great interest in determining how
17 much protection to give California speakers," *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp.
18 2d 1118, 1158 (N.D. Cal. 2003), California's legislative policies designed to deter baseless tort
19 actions should have no bearing on actions filed in New Jersey.  California's domestic concerns
20 alone are insufficient to overcome New Jersey's interest in regulating its own courts.  Nothing
21 First DataBank has offered on the governmental-interest factor would justify the extra-territorial
22 application of California's anti-SLAPP statute.  The California anti-SLAPP statute should apply
23 only to "wholly domestic concerns" and not the "multi-state situation." *Fu*, 733 A.2d at 1142.

---

[4] Schering erroneously contends that New Jersey's competing interest is in allowing New Jersey citizens access to New Jersey courts to bring meritorious tort actions. The purpose of the anti-SLAPP statute is to curtail meritless claims designed only to chill protected speech. The anti-SLAPP procedure, even if applied here, would not result in the dismissal of a legitimate lawsuit.

9

### C. Interests Underlying the Field.

The interests served by an anti-SLAPP statute are ostensibly the deterrence of frivolous lawsuits designed to chill speech and the prevention of the abuse of judicial processes. The *LoBiondo* court in New Jersey echoed those considerations when it held that the SLAPP case before it "should have been promptly dismissed with prejudice on defendants' motion for summary judgment." *LoBiondo*, 733 A.2d at 518. In contrast, in a true SLAPP action (which this is not) a special motion to strike is favored. The anti-SLAPP statute "establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary judgment-like procedure at an early stage of the litigation," which limits the costs of defending against such a lawsuit given the short time frame for hearings and the automatic stay of discovery. *Varian Med. Sys., Inc. v. Delfino*, 106 P.3d 958, 966 (Cal. 2005). This certainly serves to deter and prevent the prototypical SLAPP suit, in which the plaintiff does not hope to win the lawsuit and instead "tries to wear down the other side by forcing it to spend time, money, and resources battling the SLAPP instead of the protected activity." *Visher v. City of Malibu*, 23 Cal. Rptr. 3d 816, 819 (2005).[5] This factor tips toward applying the more efficient anti-SLAPP statute's procedure to this action.

### D. Interests of the Parties and Interests of Judicial Administration.

When considering the interests of the parties, courts "focus on [the parties'] justified expectations and their needs for predictability of result." *Fu*, 733 A.2d at 1141. In this case, this factor overlaps with the inquiry into the "interests of judicial administration," which requires a court "to consider the relative ease in determination and application of the choice of law regarding a specific issue, a factor that in turn furthers the values of uniformity and predictability of result." *Id.* at 1142 (citing Restatement (Second) Conflict of Laws 145, cmt. b). Both parties had a justified expectation that California's anti-SLAPP statute would not be applied anywhere other than California. Neither party has identified any decision applying

---

[5] The Court doubts, however, whether such interests are served where, as here, the parties are two sophisticated corporations with enormous resources.

10

California's anti-SLAPP statute extra-territorially. Thus, First DataBank, even as a California defendant, could not have had any expectation that it would have had the benefit of the anti-SLAPP procedure when being sued in New Jersey. Moreover, restricting the anti-SLAPP mechanism to courts sitting in California would advance the values of "uniformity and predictability of result."

First DataBank relies on *Global Relief Foundation v. New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *12 (N.D. Ill. Sept. 11, 2002). That decision did not consider whether the anti-SLAPP statute could apply outside of California, contrary to what First DataBank argues. Instead it only assumed *arguendo* that the anti-SLAPP statute applied and concluded that the complaint would not have been stricken under the statute. *Id.* at *12 ("Assuming that the Anti-SLAPP statute may be applied in this case, this Court is unconvinced that it requires dismissal of this action."). *Global Relief* is inapplicable.

### E. Contacts.

Further case-specific reasons justify a rejection of the anti-SLAPP procedure under New Jersey conflict-of-law principles. New Jersey courts consider other factors set forth in Restatement Section 145 that relate to the "contacts that are most germane to the governmental-interest test" and add context to the analysis. *Erny*, 792 A.2d 1217. Those factors are "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Ibid.* This order holds that New Jersey possesses the contacts most relevant to the instant choice-of-law question, weighing in favor of not applying the anti-SLAPP statute to this action.

Here, First DataBank has its principal place of business in California and is incorporated in Missouri. Schering is incorporated in and has its principal place of business in New Jersey. Although First DataBank compiles the NDDF database in California, the database is published in other states, including New Jersey. In a situation such as this, the Restatement recognizes

that "if the aggregate communication disparages, or otherwise causes pecuniary loss to, the plaintiff's trade or business, the applicable law will usually be the local law of the state where the plaintiff has his principal place of business." Restatement (Second) Conflict of Laws 151, cmt. c. Here, that location is New Jersey.

Finally, this order considers the "place where the relationship, if any, between the parties is centered." At oral argument, First DataBank contended that the parties' California-based licensing agreement applied to this action and dictated the law to be applied. This order rejects that contention. Although First DataBank has licensed the limited use of the NDDF database to Schering, the relevant provisions of that contractual agreement were never intended to apply to a tort action such as this.

The agreement upon which First DataBank relies is that which the magistrate judge in New Jersey considered when transferring the action to this district. The licensing agreement permitted Schering to use the NDDF database, as a "Licensed Product" only "for pricing and competitive analysis" (App. 1).[6] The agreement contained a choice-of-law clause and forum-selection clause that defendants contend should fully apply to this action. The choice-of-law clause stated: "This Agreement shall be governed by and construed in accordance with the laws of the United States and the State of California, as applied to Agreements entered into and to be performed entirely within California and between California residents" (Breen Decl. Exh. J at 5). This action is based on allegations that First DataBank is making false statements about Schering's Proventil HFA. It does not require any consideration of how the agreement should be construed. In both the opposition to the preliminary injunction motion and the briefs in support of the instant motion, First DataBank did not rely on any defenses based on the agreement. It is clear that the choice-of-law clause does not apply to this action.

---

[6] Appendix 1 to this order is the parties' full agreement, including all exhibits, provided to the Court by counsel after oral argument.

12

The forum-selection clause stated: "In the event of any dispute concerning this Agreement or the Licensed Products, suit may be brought only in a court of competent jurisdiction in the U.S. District Court of the Northern District of California or in the California Superior Court for the County of San Mateo" (Breen Decl. Exh. J at 5).  In light of the forum-selection clause, First DataBank argues that Schering engaged in improper forum shopping and violated the agreement by filing the action in New Jersey.  Indeed, the New Jersey district court found that the forum-selection clause did apply and accordingly transferred this action to this district.  The Court respectfully disagrees with the New Jersey district court and First DataBank's broad construction of the scope of the forum-selection clause.

In this tort action, Schering does not allege that First DataBank violated the parties' licensing agreement or otherwise prevented Schering from benefitting from the licensing agreement.  Although the action "concerns" the NDDF database, it would inappropriately extend the parties' agreement to hold that the parties contemplated that *tort* claims wholly divorced from the existence of the agreement would also be governed by the forum-selection clause.  With respect to the alleged misrepresentations at issue, the fact of the parties' ongoing agreement has no bearing on the claims.  The NDDF database contains representations about products manufactured by many drug companies.  For purposes of this action, Schering is simply a drug manufacturer whose products may have been disparaged by First DataBank's database.  The agreement played no role in giving rise to these claims.  Indeed, Schering never had access to the generic code sequence number, one of the key disputed fields in this case, until early February 2007, months *after* this case was initiated.  Schering still does not have access to the generic code number, another field at issue.  In sum, this is not a case where Schering is "avoiding a forum selection clause by simply pleading non-contractual claims *in cases involving the terms of a contract* containing the parties' choice of forum."  *Crescent Intern., Inc. v. Avatar Communities, Inc.*, 857 F.2d 943, 945 (3d Cir. 1988) (emphasis added).

13

This action is not governed by the forum-selection clause and Schering did not violate it by filing in New Jersey.[7]

\*     \*     \*

This order holds that, after considering New Jersey's governmental-interest choice-of-law analysis, the factors weigh strongly against applying California's anti-SLAPP statute to the present action. California's domestic concerns would not be significantly advanced by applying California's anti-SLAPP statute in other jurisdictions. The motion may be denied for this reason alone.

### 2. WHETHER THE ACTION IS COVERED BY THE ANTI-SLAPP STATUTE.

Even assuming *arguendo* that the anti-SLAPP statute applies, the motion to strike would be denied.

> A court considering an anti-SLAPP motion must engage in a two-part inquiry. First, in order to prevail on a motion to strike, the moving party must make an initial prima facie showing that the claimant's suit arises from an act in furtherance of its rights of petition or free speech in connection with a public issue. "An act in furtherance" includes, but is not limited to, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public concern." Cal. Civ. Proc. Code § 425.16(e)(3).
>
> Second, once the defendant has made a prima facie showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims. To do this, the plaintiff must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of *facts* to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.

*New.Net, Inc.*, 356 F. Supp. 2d at 1098–99 (some citations and quotations omitted). This order need not consider the first prong of the analysis — whether First DataBank's publication of the NDDF database is an "act in furtherance" of its right to free speech. Schering has satisfied the

---

[7] There is no point in sending the case back to New Jersey. This Court will go ahead and preside over its adjudication.

14

second prong of the analysis by making a *prima facie* showing of facts to sustain a favorable judgment. At all events, the motion to strike would have to be denied for that reason.

In the second prong of the anti-SLAPP analysis,

> [o]nce it is determined that an act in furtherance of protected expression is being challenged, the plaintiff must show a "reasonable probability" of prevailing in its claims for those claims to survive dismissal. To do this, the plaintiff must demonstrate that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." This burden is "much like that used in determining a motion for nonsuit or directed verdict," which mandates dismissal when "no reasonable jury" could find for the plaintiff. Thus, a defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or "when no evidence of sufficient substantiality exists to support a judgment for the plaintiff."

*Metabolife Intern., Inc.*, 264 F.3d at 840.

In the order denying Schering's motion for a preliminary injunction, the Court considered Schering's substantive claims and found it unlikely that Schering would prevail. For purposes of the motion to strike, however, the probability-of-success standard is much more lenient in favor of Schering. While for its preliminary injunction motion Schering had to demonstrate a "strong likelihood of success on the merits," *Johnson v. Cal. State Bd. of Accountancy*, 72 F. 1427, 1430 (9th Cir. 1995), Schering now only has to prove that a "reasonable jury" *could* find in its favor, *Metabolife Intern., Inc.*, 264 F.3d at 840. "In ruling on a motion to strike, the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff." *Nagel v. Twin Labs., Inc.*, 134 Cal. Rptr. 2d 420, 424 (2003). Indeed, the California Supreme Court has recognized that the anti-SLAPP "statute poses no obstacle to suits that possess minimal merit." *Navellier v. Sletten*, 52 P.3d 703, 712 (Cal. 2002). This order holds that Schering's trade-libel claim possesses more than "minimal merit."

In New Jersey, the "elements of trade libel [or product disparagement] are: (1) publication; (2) with malice; (3) of false allegations concerning its property, product or

15

1  business, and (4) special damages, *i.e*. pecuniary harm." *Mayflower Transit, LLC v. Prince*, 314
2  F. Supp. 2d 362, 378 (D.N.J. 2004).[8]  For purposes of the instant motion, this order accepts as
3  true all of the evidence favorable to Schering and holds that a reasonable jury could find in
4  Schering's favor.

5       First DataBank conveys information to its subscribers concerning Schering's Proventil
6  HFA and the other HFA products.  First DataBank describes the clinical formulation for
7  Proventil HFA as "multi-source" and has assigned to it a non-unique generic code number and
8  generic code sequence number.  Thus, each of the codes generated by First DataBank with
9  respect to the three HFA drugs are identical.  In contrast, Medi-Span, one of First DataBank's
10 competitors, classifies each of the HFA products as "single source" items (Fine Decl. ¶¶ 7–10).
11 Furthermore, First DataBank has continued to publish its information while the FDA has
12 assigned the HFA products a "BX" code, meaning that they are presumed to be therapeutically
13 inequivalent because of insufficient data on the drugs' potential equivalence (Kowalski Decl.
14 Exh. D. at xviii).

15      Schering offered evidence regarding what occurs at pharmacies subscribing to either the
16 NDDF or Medi-Span databases.  Pharmacists at Rite-Aid, for example, a pharmacy relying on
17 the NDDF database, understand the NDDF information to indicate that the HFA products are
18 appropriately substitutable for each other.  Schering contends that this has induced those
19 pharmacists to inappropriately substitute other HFA products for Proventil HFA when Proventil
20 HFA is prescribed.  Pharmacists at Walgreens Pharmacy, however, which relies on
21 Medi-Span's database, understand the database display to mean that *only* Proventil HFA may be
22 dispensed when Proventil HFA is prescribed.  Schering argues that at those pharmacies

---

[8] At oral argument, the parties agreed that there was no substantive difference between the laws of California and New Jersey for a claim of trade libel. In California, to "prove trade libel, Plaintiff must show: (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages." *New.Net, Inc.*, 356 F. Supp. 2d at 1113 (citation and quotations omitted).

16

subscribing to Medi-Span's database, pharmacists only dispense Proventil HFA when that drug is prescribed (Fine Decl. ¶¶ 11–12).

According to Schering, this has led to pecuniary harm because patients who have been prescribed Proventil HFA have been provided with either ProAir HFA or Ventolin HFA. Considering that pharmacists have written 40,000 prescriptions per month for Proventil HFA, this translates to potentially great pecuniary harm for Schering. Indeed, between June and August 2006, approximately forty percent of the prescriptions written for Proventil HFA were filled with another HFA product (Grote Decl. ¶ 9).

First DataBank principally contends that Schering cannot prove that the NDDF database contained false information. In the order denying Schering's motion for a preliminary injunction, the undersigned held it to be unlikely, based on the declarations and exhibits filed, that Schering could prove falsity. Schering has put forth enough facts, however, to demonstrate that its claim of falsity — while perhaps not likely to succeed — is not frivolous. It is true that First DataBank publishes the FDA's BX code for the HFA products, thereby indicating the FDA's position that the drugs are to be presumed not therapeutically equivalent. All the other fields created by First DataBank, however, are identical for all three HFA products. One important field, for example, is the generic code sequence number, which identifies "candidates for substitution." This order cannot find as a matter of law that these identical codes do not communicate to a pharmacist that the drugs are therapeutically equivalent and substitutable. Indeed, an article co-authored by the director of the Division of Medication Errors and Technical Support of the FDA's Office of Drug Safety stated: "Although all three products contain the same active ingredient and propellant (HFA), they are not substitutable products. Differences in excipients such as oleic acid and alcohol — in addition to actual differences in device components, such as the canister and size of valve — may affect performance, resulting in different clinical responses" (Mot. for Prelim. Inj. Exh. 2). To the extent that First DataBank may be implying the products are substitutable, a reasonable jury might find that First DataBank is communicating false, product-disparaging information.

17

\*        \*        \*

In sum, this order holds that Schering's claim for trade libel is not frivolous. The motion to strike based on California's anti-SLAPP statute would be denied even if the statute applied to this case.

## CONCLUSION

For the foregoing reasons, First DataBank's motion to strike is **DENIED**.

**IT IS SO ORDERED.**

Dated: April 20, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE